# In the United States Court of Federal Claims

No. 10-481

(Filed: August 16, 2010)

* * * * * * * * * * * * * * * * * * * *

NAVARRO RESEARCH AND
ENGINEERING, INC.,

        *Plaintiff*,

v.

THE UNITED STATES,

        *Defendant*,

and

PORTAGE, INC.

        *Intervenor*.

Bid protest; mandatory post-award debriefing; automatic stay; standing; task order contract; 28 U.S.C. § 1491; 41 U.S.C. § 253j Federal Supply Schedule; FAR Part 8.4

* * * * * * * * * * * * * * * * * * * *

    *Kenneth B. Weckstein,* Washington, D.C., for plaintiff.

    *William J. Grimaldi*, United States Department of Justice, Civil Division, Washington, D.C., for defendant.

    *Michael J. Vernick*, Washington, D.C., for intervenor.

_____

OPINION

_____

BRUGGINK, Judge.

    This is a post-award bid protest. Plaintiff, a disappointed bidder, moved for a preliminary injunction and a temporary restraining order. Defendant and intervenor opposed the grant of injunctive relief, and defendant moved to

1

dismiss pursuant to Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC"). We heard oral argument on August 6, 2010. Immediately afterward, citing the reasons stated at oral argument, we denied plaintiff's motion for injunctive relief and defendant's motion to dismiss. This opinion more fully explains our reasoning.

FACTUAL BACKGROUND[1]

Plaintiff, Navarro Research and Engineering, Inc. ("Navarro"), is the incumbent contractor at a Department of Energy ("DOE") facility near Carlsbad, New Mexico, providing environmental consulting services and operational assistance at the facility. The facility is designed to safely and permanently store radioactive waste produced by the Department of Defense by placing it in sealed containers thousands of feet underground in a former salt mine. Navarro's contract expired on August 10, 2010.

On May 30, 2010, the DOE issued Request for Quotations #DE-SOL-0001679 ("the RFQ") for the same work at the Carlsbad facility. The RFQ was issued under the Federal Supply Schedule ("FSS") and sought "expert technical advice, support, and assistance . . . in the areas of quality assurance, auditing and assessment, safety, nuclear safety, site operations, environmental and regulatory compliance, scientific and international programs, and performance demonstration program[s]." AR 4. Though labeled a contract for Environmental Consulting Services, the RFQ sought expertise in areas as diverse as welding, tractor-trailer driving, mine ventilation, and permit compliance.

Four supply schedule contractors, including Navarro, bid on the job. The DOE selected Portage, Inc. ("Portage"). for award of the task order. Upon being informed that it would not receive the award, Navarro requested a debriefing. The DOE contracting officer declined, noting that under Federal Acquisition Regulation ("FAR") Part 8, there was no requirement to debrief a disappointed bidder. DOE did, however, offer Navarro an informal information exchange.

---

[1] These facts are drawn from the Administrative Record ("AR") and the parties' briefs and are undisputed unless otherwise noted.

Ten days after the contract was awarded, Navarro filed a bid protest at the Government Accountability Office ("GAO"). GAO, however, did not notify DOE of the protest that same day. Because the contracting agency did not receive notice of Navarro's protest until more than 10 days after the award, there was no automatic stay,[2] which would have halted the transition to Portage during the pendency of Navarro's protest. On July 27, 2010, Navarro filed suit here seeking an injunction requiring DOE to provide it with a debriefing.[3]

## LEGAL AND REGULATORY BACKGROUND

The issue before the court involves two specific acquisition processes: Federal Supply Schedules ("FSS") task orders and task order contracts under the Federal Acquisition Streamlining Act of 1994 ("FASA"). As we explain below, these two acquisition processes, despite some similarities, are distinct.

The FSS process, also known as the Multiple Award Schedule ("MAS") or GSA Schedules Program, is "a simplified process for obtaining commercial supplies and services at prices associated with volume buying." 48 C.F.R. 8.402(a) (2010). Under the FSS, the General Services Administration ("GSA") negotiates long term, government-wide contracts with several companies to provide some specific item or service. *See* 48 C.F.R. 8.402. The resulting contract between GSA and the provider is for an indefinite quantity of the item to be delivered at an indefinite date during the contract period for a price that GSA has determined to be fair and competitive. *Id.* GSA then publishes "schedules" listing the goods, providers, and prices. An agency seeking to purchase such an item may simply select a provider from the list and order the desired item. *Id.* These orders need not be further competed,

---

[2] 31 U.S.C. § 3553(d)(3)(A) states that performance of a newly awarded contract is automatically stayed if the agency receives notice of a protest at GAO within a certain time window. That window begins at the date of the contract award and ends either 10 days later or five days after a debriefing, whichever is later.

[3] Navarro candidly admits its purpose in seeking this debriefing is to trigger the "automatic stay provision" of 31 U.S.C. § 3553(d)(3). The debriefing does not itself trigger an "automatic" stay. Rather, the debriefing merely serves to extend the window of time in which Navarro can file a protest at the GAO and receive a stay. It is this protest, not the debriefing, which can trigger the stay if timely.

although agencies can and do invite listed contractors to submit a better price or explain how their goods or services will best fill the agency's requirements.

FASA task orders, however, comprise a distinct acquisition process. FASA was a "comprehensive overhaul of the federal acquisition laws," S. Rep. No. 103-258, at 3 (1994), intended to "simplify and streamline" the sometimes onerous competitive requirements imposed by prior law. *Digital Tech, Inc., v. United States*, 89 Fed. Cl. 711, 719 (2009). In addition to simplifying the bid protest process, FASA "streamlined procurements involving task or delivery order contracts." *DataMill, Inc. v. United States*, 91 Fed. Cl. 740, 752 (2010). It did so by encouraging federal agencies to use "multiple task order contracts, in lieu of single task order contracts" when possible. *Digital Tech,* 89 Fed. Cl. at 719 (citing S. Rep. 103-258). A multiple task order allows an agency to select a contractor and secure certain contract terms through an initial competitive process, but to make subsequent orders pursuant to that contract without going through the competitive process. "In other words, once the task or delivery order contract itself has been obtained through full and open competition, orders made pursuant to that contract are immune from CICA's[4] full and open competition requirements." *Correl Corp. v. United States*, 165 F. Supp. 2d 12, 20 (D.D.C. 2001).[5]

## DISCUSSION

We have jurisdiction under the Tucker Act to hear protests "in connection with a procurement or proposed procurement." 28 U.S.C. § 1491(b)(1). In a bid protest, the court "may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs." 28 U.S.C. § 1491(b)(2). The Tucker Act also mandates that our standard of review is the same as that found in the Administrative Procedures Act. *Id.* § 1491(b)(4) ("In any action under this subsection, the courts shall review the

---

[4] The Competition in Contracting Act of 1984 ("CICA") encouraged competition for all types of government contracts. Subsequent legislative developments, including FASA, sought to narrow CICA's scope to promote contracting efficiency.

[5] This is true, with the exception of certain enhanced competitive procedures for high value task orders now mandated by 41 U.S.C. § 253j(d) (Supp. I 2010).

agency's decision pursuant to the standards set forth in section 706 of title 5."). Thus, we may hold unlawful and set aside any agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2006).

Navarro seeks a temporary restraining order and preliminary injunction requiring the DOE to provide a post-award debriefing. In its response, the government moved to dismiss on the grounds that Navarro lacks standing to bring this suit and also argued that Navarro cannot satisfy the standard to obtain injunctive relief. We address each of these arguments in turn.

*I.    Standing*

Standing is a threshold jurisdictional issue. *Myers Investigative & Sec. Servs., Inc., v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102-04 (1998)). The doctrine of standing ensures that the party seeking redress is properly entitled to have the court decide the dispute or issue. *Warth v. Seldin*, 422 U.S. 490, 498 (1975). It is an outgrowth of the Constitution's "case or controversy" requirement, and, although we are an Article I court, we generally apply the same standard as the federal courts created under Article III. *Anderson v. United States*, 344 F.3d 1343, 1350 n.1 (Fed. Cir. 2003). This standard requires that, to have standing, a litigant must have suffered a concrete and particular injury that is fairly traceable to the defendant's action and which is likely to be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

In the bid protest context, the standing issue is framed by 28 U.S.C. § 1491(b)(1), which grants jurisdiction over a protest brought by an "interested party":

> Both the Unites [sic] States Court of Federal Claims and the district courts of the United States shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. . . .

28 U.S.C. § 1491(b)(1) (2006). Though the statute does not speak of standing, its requirement of an interested party has been interpreted as "impos[ing] more stringent standing requirements than Article III." *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009) (citing *Am. Fed'n of Gov. Employees v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001)). Here, the crux of the standing argument is whether Navarro is an interested party.

At first blush, Navarro—the incumbent contractor and a disappointed bidder—seems the very model of an interested party, having failed in its bid to receive a contract valued at nearly $30 million. The government, however, argues that Navarro does not qualify as an interested party and thus lacks standing. The government's argument, discussed in more detail below, is drawn from decisions in which the plaintiff was challenging the merits of an award. We believe that Navarro's situation is sufficiently different from the typical bid protest that a different standing requirement should apply here.

The government's argument begins by noting that, although 28 U.S.C. § 1491 does not define an interested party, past cases have applied the definition found in the Competition In Contracting Act, 31 U.S.C. § 3551(2) (2006). Def. Resp. 4 (citing *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 1996)). Under this definition, interested parties are those "actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract." 31 U.S.C. § 3551(2)(A); *Rex Serv. Corp.*, 448 F.3d at 1307. While plaintiff would obviously meet that requirement, the government next draws from decisions holding that a protestor has a "direct economic interest" only if it could be put in a position for award as a result of prevailing in its bid protest. Def. Resp. 5 (citing *United States v. Int'l Bus. Machs. Corp.*, 892 F.2d 1006, 1011 (Fed. Cir. 1989)). In other words, the contractor "must show that there was a 'substantial chance' it would have received the contract award but for the alleged error in the procurement process." *Info. Tech. & Applications v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003); *see also Myers*, 275 F.3d at 1369-70 ("[P]rejudice (or injury) is a necessary element of standing.").

In the present action, Navarro is not challenging the procurement decision itself but rather seeks to enforce a post-award procedural remedy—an allegedly mandatory debriefing. In other words, even if Navarro were to prevail here, it would not be awarded the contract. It would still have to obtain review of the merits of the award and succeed. Thus, the government argues, Navarro has no direct economic interest, is not an interested party, and

therefore lacks standing. Although the precise question presented is one of first impression,[6] we believe that the relevant statutes and related case law mean that the government is incorrect.

The government's argument relies on standing doctrine developed in typical bid protests, in which the winner of the competition has been announced or even awarded the contract. In such a "substantive" challenge to a procurement, it makes sense to insist that the protestor has a substantial chance at the award. Otherwise, the court's ruling would serve no purpose, neither changing the award nor redressing the protestor's real grievance.

In *Weeks Marine, Inc. v. United States*, 575 F.3d 1352 (Fed. Cir. 2009), the Federal Circuit confronted a challenge to standing in a pre-award protest, in which the plaintiff challenged the agency's decision to use task order contracts rather than sealed bidding procedures. *Id.* at 1354-58. The challenge, in other words, was not unique to the plaintiff's circumstances. It went to the validity of the entire solicitation process. The Court of Federal Claims had ruled in favor of the contractor and enjoined the agency from moving forward with the solicitation. On appeal, the government, relying on standing decisions developed in post-award contexts, made the same challenge to standing which it makes here—that plaintiff's injury was too speculative because there was no assurance that, if successful with the protest, plaintiff would receive the award.

The Federal Circuit rejected the government's argument. It began with the proposition that determining bid protest standing is a two-prong test requiring the protestor "to establish that it '(1) is an actual or prospective bidder and (2) possess[es] the requisite direct economic interest.'" *Id.* at 1359 (quoting *Rex Serv. Corp.*, 448 F.3d at 1308). The first prong was not disputed. *Id.* at 1359-60. As to the second prong, the *Weeks Marine* court held that the unique context of pre-award bid protests merited a modification of the usual standing requirement. It rejected the "substantial chance" definition of direct economic interest in favor of a more inclusive test. *Id.* at 1361-62. The court adopted the standard used by the trial court, in which "standing is established

---

[6] We have in the past considered a nearly identical issue with regard to a protest of a GSA FSS task order, but plaintiff's standing was neither challenged by the government nor addressed in the opinion. *See Systems Plus, Inc. v. United States*, 68 Fed. Cl. 206 (2005).

by alleging a 'non-trivial competitive injury which can be redressed by judicial relief.'" *Id.* at 1361 (quoting unattributed source). This standard "strikes the appropriate balance between the language of § 1491(b)(1) . . . and Article III's standing requirements." *Id.* at 1362. The court noted that a different result would lead to the anomalous outcome that the protestor had no standing, but if it subsequently challenged an actual award at a later point in the process, it would be confronted with the argument that, by not protesting, it had waived the right to challenge the terms of the solicitation.

The court also reasoned that a different result would be at odds with prior decisions recognizing the broad terms of 28 U.S.C. § 1491's jurisdictional grant to this court. *See RAMCOR Serv. Group, Inc. v. United States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999) (noting that language in § 1491(b)(1) "is very sweeping in scope"). This court has been given jurisdiction to hear challenges to "any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). Denying standing to a protestor attempting to enforce one of the statutory requirements related to a procurement would be tantamount to making the procedure illusory.

We therefore conclude that the *Weeks Marine* standard strikes the appropriate balance in a bid protest seeking an allegedly mandatory post-award debriefing. An interested party is an actual or prospective bidder alleging a non-trivial competitive injury related to the procurement which can be redressed by judicial relief. Here, Navarro satisfies this standard and therefore has standing.

Navarro satisfied the first prong of the test—an actual or prospective bidder—when it submitted a bid on the RFQ. We also believe Navarro has satisfied the second prong by alleging a non-trivial competitive injury capable of judicial redress. If Navarro were to prevail here and receive the debriefing it seeks, it would then have the ability, assuming it refiled a protest at GAO, to trigger a stay of the transition to the new contractor. In such situations, it is not uncommon for the incumbent contractor to continue performance during the pendency of the stay. The ability to perform during this interim period is not a trivial benefit. Furthermore, the information gleaned from the debriefing could be helpful to Navarro in its protest at GAO and in shaping its future bidding strategies. Finally, a stay in place during the pendency of a protest allows the court, in the event the protest is well founded in fact and law, to award injunctive relief without the extraneous concern that too much work has

been performed by the putative awardee to prevent undue harm to it or the government.

In sum, Congress created a mechanism that gives a bidder the presumptive right to a stay during the pendency of a bid protest at GAO. We need not second guess why Congress believed it important to the competitive process to create such a possibility. Nor do we second guess the assignment to this court of the responsibility to hear protests involving a statute or regulation connected with that same procurement. It is sufficient to say that our obligation to hear the latter type claim would be meaningless if the protestor here had to persuade us that it would succeed at GAO. Plaintiff has standing.

*II.    Injunctive relief*

A preliminary injunction is "an extraordinary and drastic remedy," *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997), and it "'is not to be routinely granted.'" *Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.*, 357 F.3d 1319, 1324 (Fed. Cir. 2004) (quoting *Intel Corp. v. ULSI Sys. Tech., Inc*., 995 F.2d 1566, 1568 (Fed. Cir. 1993)). A party seeking injunctive relief must demonstrate (1) a likelihood of success on the merits, (2) it will suffer irreparable harm without the injunction, (3) the balance of hardships favors the party seeking the injunction, and (4) the public interest favors granting injunctive relief. *Erico Int'l Corp. v. Vutec Corp*., 516 F.3d 1350, 1353-54 (Fed. Cir. 2008).

Here, the primary issue involves the likelihood of Navarro's success on a single legal argument—that 41 U.S.C. § 253j(d) requires the DOE to provide the protestor with a post-award debriefing. Because we believe that section 253j(d) does not apply to FSS awards such as this one, we do not believe it likely that Navarro will succeed on the merits. As we explain below, although the FSS and FASA processes resemble each other, they are distinct and the requirements of section 253j apply only to FASA task orders.

Plaintiff presents the court with the language of 41 U.S.C. § 253j(d), arguing that, irrespective of whether the task order was issued pursuant to a FSS or FASA contract, it mandates that all unsuccessful offerors for task orders over $5,000,000 be provided a debriefing. Plaintiff contends that this is made clear by the plain language of section 253j and surrounding sections, by legislative history, and by the language of the RFQ. We disagree.

9

Section 253j(d), enacted as part of the National Defense Authorization Act of 2008 ("NDAA"), provides for enhanced competition for task orders over $5,000,000:

> **Enhanced competition for orders in excess of $5,000,000**–In the case of a task or delivery order in excess of $5,000,000, the requirement to provide all contractors a fair opportunity to be considered under subsection (b) is not met unless all such contractors are provided, at a minimum–
>
> . . .
>
> (5) an opportunity for a post-award debriefing consistent with the requirements of section 2305(b)(5) of this title.

41 U.S.C. § 253j(d)(5) (Supp. I 2010). Plaintiff argues that the language of this provision is broad and applies across all federal procurements to all task orders above the stated amount. This means, according to Navarro, that the debriefing called for in 253j(d)(5) is not limited to acquisitions under Title 41 but applies also to the GSA FSS task order at issue here.

Defendant and intervenor urge that plaintiff's argument is contradicted by other related statutory provisions. Subsection 253j(g) states that the enhanced competition afforded to large task orders "applies to task and delivery order contracts entered into under sections 253h and 253i of this title." 41 U.S.C. § 253j(g). The RFQ issued here, however, was issued under the authority found in Title 40, which establishes the GSA FSS.

Plaintiff counters that the task order here is the same contract vehicle characterized in section 253j as a "task order contract." That term, it points out, is defined in section 253k as a "contract for services that does not procure or specify a firm quantity of services (other than a minimum or maximum quantity) and that provides for the issuance of orders for the performance of tasks during the period of contract." 41 U.S.C. § 253k (2006). Navarro points to the fact that under the RFQ, once the task order is awarded, DOE will subsequently issue more particularized orders for the performance of tasks during the relevant period. The RFQ states, "other deliverables and task order work products will be specified by DOE when subtask orders are issued which provide estimated cost and labor hour ceiling by functional areas of the SOW." AR 27. A sample subtask order form was attached to the RFQ. *See* AR 136.

The "Subtask Ordering Procedures" section in the SOW provides that the "CO may issue subtask orders to the contractor, providing specific authorization or direction to perform the work within the scope of the task order and as specified in the schedule." AR 27. Plaintiff contends that this process of awarding a master task order, to be implemented by subsequent subtask orders, means that the award at issue is a task order contract within the meaning of section 253k.

Navarro also points the court to section 253i(a)(2), which deals with the authority to enter into task order contracts for "advisory and assistance services." "The head of an executive agency may enter into a task order contract for advisory and assistance services only under the authority of this section." 41 U.S.C. 253i(a)(2). Navarro argues that the RFQ is a task order contract for advisory and assistance services, pointing to language in Sample Task Order form: "with respect to the advisory and assistance services provided in connection with the task order . . . ." AR 135; *see also* AR 9 ("(CTAC) shall provide expert technical advice, support, and assistance to the CBFO"). Thus, in plaintiff's view, the authority supporting this procurement had to come from Title 41, notwithstanding the fact that the RFQ was issued under the GSA FSS.[7]

Plaintiff undergirds all of its arguments with language from the 2007 Acquisition Advisory Report, a document generated by the congressionally created Acquisition Advisory Panel.[8] Among other things, the panel recommended increasing competition for "multiple award . . . ('IDIQ')

---

[7] Plaintiff also contrasts the limiting language in section 253i(a)(2) with the absence of such a limitation in section 253h. Section 253h(g) states that nothing in this section can be construed to limit the authority of the head of an executive agency or the GSA to enter into "schedule, multiple award, or task or delivery order contracts under any other provision of law." 41 U.S.C. § 253h(g). Plaintiff believes this distinction further boosts its argument that the only authority for an advisory and assistance service task order contract is found in Title 41.

[8] Congress empaneled the Acquisition Advisory Panel in the National Defense Authorization Act for FY 2004, Pub. L. No. 108-136, § 1423, 117 Stat. 1392, 1669 (Nov. 23, 2003). It tasked the panel with reviewing policies, laws, and regulations dealing with public procurement, including government-wide contracts. *See id*. § 1423(a), 117 Stat. 1392, 1669.

contracts, as well as under the GSA Schedule . . . ; providing a debriefing for large orders . . . ." Report of the Acquisition Advisory Panel to the Office of Federal Procurement Policy and the United States Congress 327-28 (Jan. 2007).

Plaintiff believes that the requirements for enhanced competition and debriefings found in section 253j are the result of this recommendation and must be read in light of the intent of the report. Plaintiff quotes language from the Report of the Senate Committee On Armed Services on the bill that would eventually become the NDAA: "task and delivery order competition requirements in the provision would implement the recommendations of the Acquisition Advisory Panel . . . ." S. Rep. No. 110-77, at 368 (June 5, 2007). Plaintiff points to similar language in the Conference Report of the corresponding House of Representatives bill. *See* H. Rep. No. 110-477, at 956 (Dec. 6, 2007) (Conf. Rep.). In plaintiff's view, the connection between the Advisory Report and the congressional reports is conclusive that congress intended to implement the Panel's recommendation in the NDAA and did so with the provisions now codified at 41 U.S.C. § 253j.

Defendant and intervenor respond generally that plaintiff has confused provisions relating to one type of federal acquisition vehicle, "task order contracts" under Title 41 (FASA), with task orders issued under the GSA FSS under Title 40. They point out that GSA FSS task order purchases, such as the RFQ here, are distinct from contracts entered into by executive agencies under FASA. The provisions thus do not apply across titles of the United States Code. Section 253j, they argue, applies only to FASA contracts.

We agree. The FSS is administered by GSA. *See* 40 U.S.C. § 501(b) (2006). It is implemented by FAR Part 8.4. GSA negotiates, and offerors compete, to enter a contract with GSA to provide products and services for a stated duration. *See generally* 48 C.F.R. § 8.402. Federal agencies can then issue task orders against the schedule for the listed goods or services.

By contrast, the Federal Acquisition Streamlining Act of 1994 ("FASA"), Pub. L. 103-355, 108 Stat. 3243 (October 13, 1994), authorizes Federal agencies to enter into multiple award contracts under which task and delivery orders will be issued. These are "task order contracts" as defined in

section 253k. FASA is codified in Title 41[9] of the United States Code and implemented in FAR Part 16. The NDAA created an exception to the prohibition of task order bid protests for task and delivery orders valued at over $5,000,000 and added the provision for mandatory post-award debriefings. *See* Pub. L. No. 110-181, §843, 122 Stat 3, 237-38 (2007) (codified at 41 U.S.C. § 253j(d)-(e)).

The FAR places these two acquisition processes in different Parts and explicitly exempts them from the reach of the others' regulations. The regulations pertaining to FSS acquisitions are found in Part 8.4 of the FAR. Those implementing the FASA process are found in Part 16. Furthermore, FAR Part 16.5, dealing with indefinite-delivery contracts, explicitly demurs from any effect on FSS contracts:

> Nothing in this subpart restricts the authority of the General Services Administration (GSA) to enter into schedule, multiple award, or task or delivery order contracts under any other provision of law. Therefore, *GSA regulations and the coverage for the Federal Supply Schedule program in Subpart 8.4 and Part 38 take precedence over this subpart*.

48 C.F.R. § 16.500(c) (2010) (emphasis added). Similarly, FAR Part 8.4 expressly exempts FSS contracts from the requirements of Parts 13, 14, 15, and 19. *See* 48 § C.F.R. 8.404(a).

The distinction between FSS and FASA acquisitions has been recognized by this court: "[Task order] contracts are different from GSA schedule contracts, however, even though both types of contracts utilize task or delivery orders to trigger performance or delivery." *Data Mgt. Svc Joint Venture v. United States*, 78 Fed. Cl. 366, 371 n.4 (2007).

We agree with defendant and intervenor that the provisions added to Title 41 by the NDAA are inapplicable to the separate GSA FSS system established by Title 40 and implemented in FAR Part 8.4. We have previously

---

[9] We note that FASA was also codified across parts of Title 10, which deals with acquisitions conducted by the Department of Defense. Because the agency in question is the DOE, none of the Title 10 provisions of FASA are relevant here.

recognized that FASA provisions do not affect or apply to acquisitions conducted under the GSA FSS, FAR Part 8.4. *See generally Labat-Anderson, Inc. v. United States*, 74 Fed. Cl. 99, 105 (2001); *Idea Int'l, Inc. v. United States*, 74 Fed. Cl. 129, 135-36 (2006). Plaintiff has not made the case for the application of section 253j outside of FASA procurements conducted under Title 41.

Plaintiff's argument that section 253j(d) applies because it does not contain an exception for procurements under FAR Part 8.4 is unpersuasive. We have previously held that section 253j(g), which sets out the applicability of section 253j, does not apply to GSA FSS task orders. *Data Mgmt. Servs. Joint Venture v. United States*, 78 Fed. Cl. 366, 371 n.4 (2007). Congress made no change to subsection (g) in the NDAA other than designating it as subsection (g).[10] Thus section 253j applies only to "task and delivery orders entered into under sections 253h and 253i" of Title 41. 41 U.S.C. § 253j(g). Section 253h gives authority to executive agencies to enter into task or delivery order contracts as defined in section 253k for the purchase of goods or services. 41 U.S.C. § 253h(a). Section 253h then goes on to establish requirements for these contracts, solicitations, and subsequent modifications. *See id.* §253h(b)-(e). Subsection (f) explains that section 253h is not applicable to advisory and assistance service contracts as defined in 31 U.S.C. § 1105(g). Subsection (g) concludes the section by stating that section 253h does not impinge on the authority granted to agencies or the head of GSA to enter into "schedule, multiple award, or task or delivery order contracts under any other provision of law." *Id.* § 253h(g). Section 253h plainly is authorizing a procurement device distinct from contracts authorized by other provisions of law, such as Title 40 and the GSA FSS. The NDAA has not changed the distinct nature of the two contractual vehicles at issue here, one authorized in Title 40 and the other in Title 41.

Section 253i likewise authorizes agencies to enter into task and delivery order contracts for "advisory and assistance services under the authority of this section." 41 U.S.C. § 253i(a). Section 253i contains similar but not identical provisions to those found in section 253h. What is absent from section 253i is a corresponding section explicitly stating that nothing in that section should be read to limit an agency's authority to enter into task order contract under

---

[10] The provision now found at subsection (g) was formerly found at subsection (f). *See* 41 U.S.C. 253j(f) (2006).

14

another provision of law. Plaintiff contends that this means that the only way for an agency to procure such services is pursuant to section 253i. Because the task order awarded to Portage fits under the definition of "advisory and assistance services," in plaintiff's view, it could only have been authorized pursuant to section 253i, and thus the task order was necessarily subject to 253j.

Although plaintiff states in its briefing that it is not protesting GSA's authority to list the services subject to the task order on the GSA FSS, that is in reality what it is doing. As we have explained above, FASA and GSA FSS contracts are separate contracting vehicles, authorized by distinct statutory provisions and implemented by different parts of the FAR. Plaintiff argues that the only authority to enter into a contract of this type is found in 41 U.S.C. § 253i. The task order at hand, however, purported to be authorized under the GSA FSS. *See* AR 5. The RFQ states that the task order is governed by FAR Part 8.4. AR 99. No other authority is listed. It follows from plaintiff's argument that this issue is not properly before the court. A protest of the agency's authority to enter a contract must be made prior to award. *See Blue and Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007) ("We also hold that a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims.")

In any event, the fact that the RFQ calls for advisory and assistance services does not mean that it was issued pursuant to section 253i. Plaintiff argues that a "task order contract" for advisory and assistance services can only be entered into under the authority of section 253i. This argument fails because the RFQ did not establish a "task order contract" as meant in section 253k. The type of contract authorized by FASA is a multiple award contract for indefinite delivery of goods or services under which multiple award umbrella contracts are awarded, but awardees subsequently will compete to fill task orders. These are the "orders for performance of tasks during the period of the contract" referenced in section 253k. If the value of the task order is over $5,000,000, section 253j provides for enhanced competition, including a mandatory debriefing.

Plaintiff confuses the subtask orders called for in the RFQ with task orders in section 253k. It points to the language in the RFQ dealing with subtask orders and contends that these are the "orders for performance of

15

tasks" contemplated in section 253k. *See* AR 27; 136. This is plainly wrong. The task order competed by the RFQ was awarded to Portage only. There is no further competition for the subtask orders. They are just fractional pieces of the larger task order awarded to Portage. No enhanced competition nor debriefing would be required as there will be no disappointed offerors. That being the case, the "task order contract" envisioned in 253h or 253i is not what was awarded here to Portage. Thus, neither section 253i nor section 253j are applicable to the RFQ. The fact that 253i does not explicitly state that nothing in the section should be read to prohibit or restrict similar contract archetypes under other provisions of law means only that a FASA task order contract for advisory and assistance contracts will be governed by the provisions of 253i exclusively. The task order here was issued pursuant to the GSA FSS and was not subject to section 253j, regardless of whether it could arguably fit under the definition of a task order contract for advisory and assistance services as authorized for FASA contracts only by section 253i.

We turn finally to Navarro's reliance on the Acquisition Advisory Panel Report. We recognize that committee reports indicate that Congress intended, in the NDAA, to implement recommendations from the Advisory Panel. But we cannot rely on these references as interpretive guidance if they fly in the face of the language of the statute as adopted. *Aaron v. SEC*, 466 U.S. 680, 695 (1980) (holding that the plain meaning of a statute governs "absent clear and strong congressional intent to the contrary"). Here we are even further removed from the normal circumstance in which a party cites legislative history. Plaintiff attempts to tell us that the legislative history ought compel us to read the provision elsewhere into the code. We decline. *Cf. Garcia v. United States*, 469 U.S. 70, 75 (1984) ("Only the most extraordinary showing of contrary intentions from [legislative history] would justify a limitation on the plain meaning of the statutory language.").

As we have explained above, the NDAA in its final and enacted form created certain enhanced competitive procedures for large task orders for FASA contracts. It did not change anything about the GSA FSS system under Title 41. Section 843 of the NDAA, amended section 253j of Title 41, adding the previously discussed competitive procedures. It also added identical provisions to section 2304a of Title 10, the defense contract portion of FASA. *See* Pub. L. No. 110-181, § 843, 122 Stat. 3, 236-37. At no point in the NDAA is there a reference to the GSA FSS or to Title 40. If Congress had intended these new procedures to apply to the GSA schedule, it would have had to do so explicitly. It did not. To the extent that Congress enacted the

recommendations of the Advisory Report, it did so only with respect to FASA under Titles 10 and 40.

## CONCLUSION

      For the reasons set out above, we denied defendant's motion to dismiss as well as plaintiff's motion for a temporary restraining order and preliminary injunction. Still pending is plaintiff's request for a permanent injunction. Plaintiff shall file a status report on or before August 27, 2010, indicating whether it wishes to proceed with consideration of the request for permanent relief.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Judge
